# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| KABLE PRODUCTS SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| TNG GP, a Delaware General Partnership, COMAG MARKETING GROUP, LLC, a Delaware Limited Liability Company, and HUDSON NEWS DISTRIBUTORS, LLC, a New Jersey Limited Liability Company, | ) ) ) ) ) ) ) ) ) | C.A. No. N16C-05-194 PRW CCLD |
| Defendants. | ) | |

Submitted: April 17, 2017
Decided: June 13, 2017

## MEMORANDUM OPINION AND ORDER

*Upon Defendants TNG GP, Comag Marketing Group, LLC, and Hudson News Distributors, LLC's Motions to Dismiss,*
**GRANTED.**

Leslie B. Spoltore, Esquire, Seth A. Niederman, Esquire, Wali W. Rushdan II, Esquire, Fox Rothschild LLP, Wilmington, Delaware, George J. Kruger, Esquire, Fox Rothschild LLP, Philadelphia, Pennsylvania (*pro hac vice*) (argued), Attorneys for Kable Products Services, LLP.

Steven L. Caponi, K&L Gates LLP, Wilmington, Delaware, Attorney for TNG GP and Comag Marketing Group, LLC.

Michael F. Bonkowski, Esquire, Nicholas J. Brannick, Esquire (argued), Cole Schotz P.C., Wilmington, Delaware, Attorneys for Hudson News Distributors.

**WALLACE, J.**

## I.    INTRODUCTION

Plaintiff Kable Products Services, Inc. ("Kable") filed suit against Defendants TNG GP ("TNG"), Comag Marketing Group, LLC ("Comag"), and Hudson News Distributors, LLC ("Hudson," and collectively with TNG and Comag, "Defendants"). Kable brings three counts against Defendants: Count I – Conspiracy; Count II – Tortious Interference with Contractual Relations; and Count III – Tortious Interference with Prospective Contractual Relations.

Before the Court are the Defendants' Motions to Dismiss. TNG and Comag assert that: (1) Kable's claims include a single allegedly tortious act that does not meet the requirement of a significant act causing the breach of contract required for Count II; (2) mere refusal to deal is not enough to support Count III; and (3) since both Counts II and III fail, there is no underlying tort to support the allegation of a civil conspiracy in Count I. TNG additionally claims that because it had no part in Comag's ultimate denial of Kable's application for wholesaler status, it should be dismissed entirely. Hudson asserts that it took no actions that would give rise to a valid claim against it, and that any facts in the complaint that include Hudson are not enough to survive a motion to dismiss.

Because Kable has not pled sufficient facts to show that there was a valid and enforceable contract to be interfered with, has not pled sufficient facts to show a significant act interfering with prospective contractual relations, and cannot,

therefore, support a claim for civil conspiracy, the Court **GRANTS** the Defendants' Motions to Dismiss as to all counts.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A. INDUSTRY BACKGROUND; KABLE AND HGR BUSINESS MODEL.

Kable is in the product fulfillment and repackaging business for consumer products. It provides logistic and delivery service for the magazine publishing industry.[1] Comag is a national distributor for large publishers;[2] TNG is Comag's majority owner;[3] Hudson is Comag's minority owner.[4]

In February 2015, Michael Duloc ("Duloc") acquired all of Kable's assets.[5] Soon thereafter, he was approached to participate in a new business model that could possibly cut costs and increase market efficiencies.[6] In anticipation of doing so, Duloc spoke with representatives from Hudson Group Retail, LLC ("HGR").[7]

---

[1]     Pl.'s Am. Compl. ¶ 11.

[2]     Pl.'s Am. Compl. ¶ 3; Hudson News Distributor's Opening Br. in Supp. of its Mot. to Dismiss Pl.'s Am. Compl at 4 [hereinafter Hudson Br.].

[3]     Hudson Br. at 4.

[4]     *Id.*

[5]     Pl.'s Am. Compl. ¶ 15.

[6]     *Id.*

[7]     Pl.'s Am. Compl. ¶ 16. HGR is not affiliated with Hudson, a defendant in this action.

At the time of the discussion between Duloc and HGR, TNG already provided some of HGR's news distribution services.[8] But the contract between TNG and HGR was set to expire by December 31, 2015. "Upon information and belief," HGR was not satisfied with TNG's services and the proposed economics for renewing its contract with TNG.[9]

In or around mid-late 2015, "upon information and belief," HGR notified a number of the major publishers and national distributors that used HGR as a distribution outlet that HGR was considering a business strategy that would result in structural changes to the news distribution industry.[10] HGR sought non-disclosure agreements with those publishers and informed them that it might seek "to have magazines shipped directly from publishers to [HGR] through an out-sourced relationship with [Kable]."[11] Kable believes several of the publishers favorably received the idea.

Based upon subsequent discussions with HGR representatives, Kable alleges several publishers informed HGR they would support HGR's new business model. Kable further alleges additional retailers expressed interest about pursuing a

---

[8]    Pl.'s Am. Compl. ¶ 17.

[9]    *Id.*

[10]   Pl.'s Am. Compl. ¶ 18.

[11]   *Id.*

-5-

possible business relationship depending on how Kable's business with HGR evolved.[12]

Kable claims that the proposed changes would "directly challenge [HGR's] current wholesale suppliers by reducing the need for their services."[13] Kable claims the new model would directly compete with certain services provided by those traditional wholesalers and that the proposed changes posed a "direct challenge to the economic interests of a number of market participants. . . ."[14]

## B. THE KABLE-HGR SERVICE AGREEMENTS.

On November 13, 2015, HGR and Kable entered into a Master Services Agreement ("the November MSA").[15] Kable alleges that the November MSA "demonstrated [HGR's] commitment to the business relationship" with Kable and that the November MSA provided significant economic benefits to Kable.[16]

On or about November 16, 2015, HGR formally notified Defendant TNG that it would not renew its contract with TNG after the contract's December 31,

---

[12]   Pl.'s Am. Compl. ¶ 20.

[13]   Pl.'s Am. Compl. ¶ 21.

[14]   *Id.*

[15]   Pl.'s Am. Compl. ¶ 22.

[16]   *Id.*

2015 expiration.[17] HGR informed TNG that Kable would provide selected services to its account and that HGR would additionally assume any services that TNG previously provided. Kable claims that HGR's actions "represented not only the loss by TNG of a significant contract, but also a broader challenge to its business and the business model enjoyed by [the other Defendants.]"[18]

After HGR did not renew its contract with TNG, Comag notified HGR "that it would refuse to distribute [Comag's] clients' titles to [HGR] through [Kable instead of TNG] since [HGR] was not on the '[Comag] approved wholesaler list.'"[19] Comag's removal from HGR's distribution business would directly adversely impact HGR.[20] Kable claims that by doing so, Comag intended to benefit both TNG and Hudson and pressure HGR into continuing its relationship with TNG.[21]

Kable alleges Comag "knew that it could exert pressure on [HGR] because the [Comag] client titles . . . account for a significant percentage of [HGR's]

---

[17] Pl.'s Am. Compl. ¶ 23.

[18] *Id.*

[19] Pl.'s Am. Compl. ¶ 24. Both TNG and Comag are members of the non-party Jim Pattison Group. *Id.*

[20] *Id.*

[21] Pl.'s Am. Compl. ¶ 25.

-7-

business."[22]  Soon after Comag stated it would not ship to HGR via Kable, HGR formed a separate entity, HG Wholesale Logistics, LLC ("HG Wholesale"). HGR intended that HG Wholesale, in lieu of HGR, could then receive shipments from Comag through Kable.[23]

On or about December 4, 2015, Kable and HG Wholesale entered into a revised Master Services Agreement ("the December MSA").[24]  The December MSA was intended to replace the November MSA, rendering the November MSA void.[25]

### C. DEFENDANTS ALLEGEDLY THREATEN KABLE AND INTERFERE WITH ITS AGREEMENTS.

Kable claims that shortly after Kable and HG Wholesale entered the December MSA, Defendants "concurrently continued to urge HG Wholesale to breach the December MSA" through a series of "closely coordinated calls reflecting an agreed-upon course of concerted action . . . sought to cajole and then coerce [Kable] into forfeiting certain of its rights under the December MSA."[26] But Kable alleges no facts that sufficiently support this averment.

---

[22]  *Id.*

[23]  Pl.'s Am. Compl. ¶ 26.

[24]  *Id.*

[25]  *Id.*

[26]  Pl.'s Am. Compl. ¶ 27.

What Kable does say is that on or about December 29, 2015, Michael Korenberg ("Korenberg," vice-chair of the Jim Pattison Group, which holds TNG and Comag) called Duloc to inquire if Duloc would be available for a call with him and James Cohen of Hudson.[27] Korenberg told Duloc that Cohen wanted to discuss how Hudson could offer a solution that would: (1) allow TNG and Kable to provide distribution and logistics services to HGR; and (2) protect Kable's economic interests through the MSAs.[28]

Duloc agreed to the call. Kable argues that Korenberg and Cohen acknowledged the existence of the December MSA during that call and understood its material terms, but again, offers no factual support for those contentions.[29] During the call, Cohen allegedly suggested restructuring certain relationships. Duloc expressed some willingness to consider such restructuring, given it was acceptable to HG Wholesale and did not cause Kable any losses.[30]

Kable claims Korenberg and Cohen sought a standstill of the Kable-HG Wholesale relationship to "protect [Kable's] economics" and "work out issues"

---

[27] Cohen has a significant ownership interest in Hudson and a minority interest in Comag. Additionally, Cohen is a minority shareholder and board member of Dufry AG, the Swiss parent company of HGR, which created HG Wholesale. Pl.'s Am. Compl. ¶ 28.

[28] Pl.'s Am. Compl. ¶ 28.

[29] Pl.'s Am. Compl. ¶ 29.

[30] Pl.'s Am. Compl. ¶ 30.

with Kable.[31] Allegedly, Cohen proposed that Kable provide certain services to TNG in exchange for Kable forfeiting certain rights under the December MSA with HG Wholesale. Cohen allegedly further suggested that pending Kable's decision on the offer, there should be a standstill under which TNG and Kable would continue to service HGR, under the former HGR-TNG contract that Kable's December MSA with HGR was supposedly going to replace. Duloc stated he didn't understand the standstill and said that Kable continued to enjoy a contract with HG Wholesale.[32]

On December 31, 2015, TNG's David Parry allegedly called Duloc with his concerns about the December MSA. Parry asked if TNG could do something "to satisfy [Kable's] business interest in exchange for [Kable's] agreement to withdraw from and/or modify its contractual relationship with HG Wholesale."[33]

As a result of these phone calls, Duloc apparently told Korenberg, Cohen, and Parry that he was committed to being transparent with HG Wholesale. Kable alleges Duloc suggested a meeting with representatives of TNG, Comag, Hudson,

---

[31]     Pl.'s Am. Compl. ¶ 31.

[32]     Pl.'s Am. Compl. ¶ 32.

[33]     Pl.'s Am. Compl. ¶ 33.

and HG Wholesale to discuss the various proposals. That meeting never happened.[34]

### D. DEFENDANTS ALLEGEDLY CONSPIRE AND INTERFERE WITH THE DECEMBER MSA.

Kable claims that because TNG lost its contract with HGR, Defendants wanted to prevent HG Wholesale from fulfilling its obligations under the December MSA.[35] "Upon information and belief," but (again) with no tangible facts recited, Kable claims the Defendants "agreed to a plan of action to pressure HG Wholesale to breach its obligations under the [December] MSA."[36] And then, Kable claims, HG Wholesale did, in fact, breach the December MSA. Specifically, Kable claims HG Wholesale breached § 3.1, related to inventory management and the associated Statement of Work ("SOW"). Section 3.1 of the December MSA requires HG Wholesale to coordinate the delivery of inventory and maintain a certain level of inventory at each facility through Kable's services.[37] Kable claims these actions by the Defendants cost Kable over $4 million in losses.[38]

---

[34]    Pl.'s Am. Compl. ¶ 34.

[35]    Pl.'s Am. Compl. ¶ 35.

[36]    Pl.'s Am. Compl. ¶ 36.

[37]    Pl.'s Am. Compl. ¶ 37.

[38]    *Id.* Kable calculated this figure through the value associated with lost revenue regarding computer logistic services, shipping, and production that were to be performed over the two years of the contract plus potential renewals. *Id.*

Kable claims that in early January 2016, TNG contacted a number of publishers whom it believed may want to enter the distribution process with HG Wholesale. Kable alleges TNG "suggested the publishers refrain from doing so as the new business model would harm TNG and require TNG to increase the prices it charged publishers in order to offset" the loss of HGR's (and others') business.[39] Kable offers nothing more to support its claim of prospective business relations.

On or about January 18, 2016, Kable alleges one of its representatives encountered Cohen by mere chance. Kable alleges that at that time, Cohen "made disparaging remarks" about HGR and HG Wholesale, "asserted in words and substance that [Kable] was 'trying to destroy the wholesale distribution system' and claimed that major publishers would refuse to supply [Kable] with product for distribution."[40] Kable's representative responded that Kable had commitments from publishers and reminded Cohen that Kable had a contract with HG Wholesale. Kable alleges Cohen acknowledged the existence of that contract (the December MSA), and stated "that it 'won't matter' because publishers would refuse to distribute" with Kable.[41]

---

[39] Pl.'s Am. Compl. ¶ 38.

[40] Pl.'s Am. Compl. ¶ 39.

[41] *Id.*

-12-

Around that same time, HG Wholesale completed its application to appear on Comag's "approved wholesaler list."[42] Kable claims that HG Wholesale properly completed the application and met all of Comag's criteria. Yet, Kable claims, "as part of the Defendants' plan to cause HG Wholesale to breach the December MSA, [Comag] rejected HG Wholesale's application on purely pretextual grounds" and "assert[ed] several deficiencies, including merchandising shortfalls," along with Kable's software system.[43] Kable asserts Comag "licenses a similar version of this same software from Kable," which, it surmises, evidences the pretextual nature of the rejection.[44] Kable says nothing more.

Comag's rejection and refusal to list HG Wholesale as an approved wholesaler precluded all of its client publishers from distributing through Kable to HG Wholesale. Kable claims this was a "critical component" of the Defendants' efforts to cause HG Wholesale to breach the MSA.[45] Kable alleges Comag, acting in concert with TNG and Hudson, intentionally interfered with and deprived Kable of the benefits of the December MSA and impaired Kable's ability to expand its new business model. Unfortunately, it does not offer many, if any, practicable facts to support this.

---

[42] Pl.'s Am. Compl. ¶ 40.

[43] Pl.'s Am. Compl. ¶ 42.

[44] Pl.'s Am. Compl. ¶ 43.

[45] Pl.'s Am. Compl. ¶ 44.

-13-

Kable claims the Defendants warned other publishers who previously supported Kable's new model to "refrain from entering into contractual relations with HGR, lest they suffer adverse economic consequences."[46] Kable asserts this created a hostile climate for HG Wholesale to perform under the December MSA, leading to HG Wholesale's eventual breach.

## III. PARTIES' CONTENTIONS

Defendants argue Kable claims a single allegedly tortious act (Comag's denial of HG Wholesale's application) resulted in breach of the December MSA. Further, they say, Count II fails because if there was any contract at all, it was an option contract that cannot be interfered with – not a final, enforceable contract – barring Count II.

Defendants also claim that Count III is not supported, because mere refusal to deal, as Comag did, is not enough to support a claim of tortious interference with prospective contractual relations. Further, conclusory statements about prospective business and a "perception" that such business would come to fruition is not enough to sustain the Count. Lastly, Defendants argue that they were privileged to openly compete in the market against Kable.

---

[46]    Pl.'s Am. Compl. ¶ 46.

Defendants argue that the conspiracy alleged in Count I ultimately fails because, once Counts II and III don't survive dismissal, there is no actionable underlying tort to support civil conspiracy.

In response, Kable asserts that the three Defendants entered into a *de facto* agreement with one another in order to deprive Kable of the benefits it sought to obtain from a new market structure and its contracts with HGR and HG Wholesale. Kable says that the Defendants knew of the contract between Kable and HG Wholesale and caused HG Wholesale to breach that contract. Kable says it thereby suffered damages both from loss of that contract and from loss of other prospective, similar contracts.

## IV.  STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Superior Court Civil Rule 12(b)(6), the Court will:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[47]

---

[47] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011) (stating standard for motions to dismiss). *See also* Del. Super. Ct. Civ. R. 12(b)(6) (2016).

-15-

If the claimant may recover under this standard of review, the Court must deny the motion to dismiss.[48]

As noted, under Rule 12(b)(6), the Court must accept as true all well-pleaded allegations.[49] And "every reasonable factual inference will be drawn in favor of the non-moving party."[50] The Court, however, will "ignore conclusory allegations that lack specific supporting factual allegations."[51] "Dismissal is warranted [only] where the plaintiff has failed to plead facts supporting an element of the claim, or [where] under no reasonable interpretation of the facts alleged could the complaint [be read to] state a claim for which relief might be granted."[52]

## V.  DISCUSSION

### A. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS.

In order to establish that Comag, TNG, and Hudson tortuously interfered with Kable's contract with HG Wholesale, Kable must show: (1) the existence of a valid and enforceable contract; (2) "about which the defendant knew"; (3) "an intentional act that [wa]s a significant factor in causing the breach of [the]

---

[48]    *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

[49]    *Cent. Mortg. Co.*, 27 A.3d at 535.

[50]    *Wilmington Sav. Fund. Soc'y, F.S.B. v. Anderson*, 2009 WL 597268, at *2 (Del. Super. Ct. Mar. 9, 2009) (citing *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005)).

[51]    *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1989).

[52]    *Hedenberg v. Raber*, 2004 WL 2191164, at *1 (Del. Super. Ct. Aug. 20, 2004).

-16-

contract"; (4) that that act was done "without justification"; and (5) that the act "cause[d] injury" to the plaintiff.[53]

### 1. To Sustain a Claim for Tortious Interference with Contract, Kable Must Show a Valid and Enforceable Contract Existed at the Time of the Alleged Interference.

For there to be tortious interference with contractual relations, there must be an underlying contract that Kable could enforce. Comag and TNG assert that the November and December MSAs were only "option contracts for the benefit of HG Wholesale and were unenforceable by [Kable.]"[54] Further, the November MSA was abandoned by both Kable and HG Wholesale upon execution of the December MSA, on or about December 4, 2015. Thus, the only contract that could have been interfered with is the December MSA. Defendants contend that the December MSA, like the November MSA, was an option contract, exercisable at HG Wholesale's sole discretion.

The Restatement explains how tortious interference can be applied to an option contract, stating

> [a] promise may be a valid and subsisting contract even though it is voidable. The third person may have a defense against action on the contract that would permit him to avoid it and escape liability on it if he sees fit to

---

[53] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265–66 (Del. 2004) (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)).

[54] TNG GP & Comag Mktg. Grp.'s Br. in Supp. of Renewed Mot. to Dismiss at 15 [hereinafter TNG & Comag Br.].

do so. Until he does, the contract is valid and subsisting relation, with which the actor is not permitted to interfere improperly. Thus, by reason of . . . conditions precedent to the obligation or even uncertainty of particular terms, the third person may be in a position to avoid liability for any breach. The defendant actor is not, however, for that reason free to interfere with performance of the contract before it is avoided.[55]

Comag and TNG assert that the December MSA is a mere option contract by virtue of the language in a number of recitals in the document itself.[56] They claim it is an option contract because HG Wholesale/HGR and Kable knew that HG Wholesale could not get inventory that Kable wanted under the original November MSA.[57] Essentially, "absent the materializing of a contingency (approval as a [Comag] wholesaler), which was out of the control of the parties to the agreement, the [December] MSA could never be performed by either [Kable] or HG Wholesale."[58]

On the other hand, Kable argues that the December MSA was an enforceable, finalized contract between the parties and that it was breached due to the Defendants' conduct.

---

[55] RESTATEMENT (SECOND) OF TORTS § 766 cmt. f (1979).

[56] TNG & Comag Br. at 17–20.

[57] *Id.* at 18.

[58] *Id.* at 19.

The December MSA was executed between Kable and HG Wholesale when Kable was already aware that HG Wholesale was not an approved Comag wholesaler.[59] Without being approved as a wholesaler by Comag, neither party could perform under the December MSA.[60] If such status was never achieved, then the obligations visited by the December MSA could not be performed.

Kable argues that Defendants tortuously interfered with the December MSA by ensuring that HG Wholesale did not achieve Comag wholesaler status, rendering the December MSA inoperative and harming Kable. However, the December MSA was essentially conditioned on HG Wholesale achieving Comag wholesaler status – a designation decision that is solely within Comag's right as a business competitor to give or retain. In essence, the December MSA was an option contract that required a number of contingencies to fall into place before it could be an enforceable and final contract between the parties.

### 2. Defendants Must Have Known of the Contract Allegedly Breached.

As to the level of knowledge necessary for a tortious interference with contract claim, Delaware courts follow § 766 of the Restatement (Second) of

---

[59]    *Id.* at 15.

[60]    *Id.*

Torts.[61] Comment *i* to § 766 discusses the knowledge requirement. And it instructs: for an actor "[t]o be subject to liability under [§ 766], the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract."[62]

According to Comag and TNG, Kable fails to allege that Comag was "aware that its refusal to designate HG Wholesale as an 'approved wholesaler' would interfere with the [December] MSA."[63] But Kable says the Defendants knew what they were doing when they attempted to keep it from the wholesaler market by allegedly interfering with the December MSA.[64]

---

[61]     *See WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) ("Delaware courts follow Section 766 of the Restatement (Second) of Torts in assessing a tortious interference claim.") (citations omitted).

[62]     RESTATEMENT (SECOND) OF TORTS § 766 cmt. *i* (1979). *See also Anesthesia Servs., P.A. v. Anesthesia Advantage, P.C. v. Winters*, 2013 WL 3352672, at *5 (Del. Super. Ct. June 27, 2013) ("The language of Comment (i) demonstrates that knowledge of the contract itself is insufficient to establish a tortious interference claim. The comment explicitly requires both 'knowledge of the contract' and knowledge '*of the fact that he is interfering with the performance of the contract*.'") (emphasis in original) (citation omitted).

[63]     TNG & Comag Br. at 22.

[64]     Kable Prod. Servs. Ans. Br. in Opp. to Defs. Mot. to Dismiss at 22–23 [hereinafter Kable Ans.].

Even if Defendants knew of the specific terms of the December MSA, the single act alleged here falls within their privilege to compete with Kable and HG Wholesale in the business world.[65] Such conduct is protected and not tortious.

### 3. Defendants Did Not Interfere with the December MSA.

Kable must show an intentional act on the part of the Defendants that amounted to being a significant factor in bringing about the alleged breach of contract to establish its claim. It fails to do so.

TNG and Comag argue that neither party could breach the December MSA because none of the contingencies that would have given rise to a performance requirement of that MSA came to fruition.[66] Further, they argue, if there were a breach of the December MSA, they engaged in no intentional act for which they could be held liable for such breach. They claim that the December 29, 2015 phone call and the second phone call discussing the standstill, along with the allegations about TNG offering Kable something to satisfy their business interest, were merely TNG attempting to offer Kable a better deal than that outlined with

---

[65]   RESTATEMENT (SECOND) OF TORTS § 768 cmt. e (1979) ("If the actor employs wrongful means, he is not justified under [§ 768]. . . . On the other hand, the actor may use persuasion and he may exert limited economic pressure. Subject to [the carve out for illegal restraint of competition], he may refuse to deal with the third persons in the business in which he competes with the competitor if they deal with the competitor. Or he may refuse other business transactions with the third person relating to that business."). *See also Wayman Fire Protection, Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *10 (Del. Ch. Mar. 5, 2014) ("[A]ll of [the] requirements [for tortious interference with contractual relations] must be considered in light of a defendant's privilege to compete or protect his business interests in a lawful manner.").

[66]   TNG & Comag Br. at 24.

-21-

HG Wholesale in the December MSA.[67] They are privileged as business competitors to do so. Comag is privileged to refuse to deal with whomever they want given there is no enforceable performance under a contract. Mere refusal to deal does not constitute an intentional act giving rise to tortious interference with a contract.[68]

### 4. *An Option Contract Can Be the Subject of Tortious Interference, But There is No Such Interference Here.*

The alleged intentional act that Comag, TNG, and/or Hudson undertook (here, their refusing to deal with HG Wholesale) must have improperly resulted in a breach of contract in order to sustain a tortious-interference-with-contract-claim. Section 767 of the Restatement cites the following factors to consider when determining if intentional interference with another's contract is improper or without justification:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.[69]

---

[67] *Id.* at 27.

[68] RESTATEMENT (SECOND) OF TORTS § 766 cmt. b (1979) ("The rule stated in [§ 766] does not apply to a mere refusal to deal.").

[69] RESTATEMENT (SECOND) OF TORTS § 767 (1979).

"Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the actor to liability. One may not, however, intentionally and improperly frustrate dealings that have been reduced to the form of a contract."[70] It is true that "[a] refusal to deal is one means by which a person may induce another to commit a breach of his contract with a third person. Thus A may induce B to break his contract with C by threatening not to enter into, or to sever, business relations with B unless B does break the contract."[71] But, "A may not, without some justification induce B to break his contract with C, A is ordinarily free to refuse to deal with B for any reason or no reason."[72] As an example, the Restatement explains:

> Upon hearing of B's contract with C, A ceases to buy from B. When asked by B to explain his conduct, A replies that his reason is B's contract with C. Thereupon B breaks his contract with C in order to regain A's business. A has not induced the breach and is not subject to liability to C under the rule stated in this Section.[73]

---

[70] RESTATEMENT (SECOND) OF TORTS § 766, cmt. b (1979). *See also Khoury v. Trumbull Physician Hosp. Org.*, 2000 WL 1804356, at *3 (Ohio Ct. App. Dec. 8, 2000) ("The mere refusal to deal with a party cannot support a claim for tortious interference with contractual relations.") (citing RESTATEMENT (SECOND) OF TORTS § 766 cmt. b (1979)).

[71] RESTATEMENT (SECOND) OF TORTS § 766 cmt. *l* (1979).

[72] *Id.*

[73] *Compare id.* at cmt. *l*, illus. 1, *with id.* at cmt. *l* illus. 2 ("Upon hearing of B's contract with C, A writes to B as follows: 'I cannot tolerate your contract with C. You must call it off. I am sure that our continued relations will more than compensate you for any payment you may have to make to C. If you do not advise me within ten days that your contract with C is at an end, you may never expect further business from me.' Thereupon B breaks his contract with C. A has induced the breach and is subject to liability under the rule stated in this Section.").

-23-

Defendants claim that Comag was privileged to compete with Kable and was therefore justified in its decision to deny HG Wholesale's application, and is therefore justified in its actions.[74] The Court agrees.

The interference Kable complains of must be improper in order to establish a cause of action.[75] In determining whether the interference is justified, the Court looks to the factors listed above.

The first factor looks to Comag's means. Comag's refusal to deal with HG Wholesale does not support a claim of tortious interference, as explained above. Even viewed in the best light for Kable, Comag was under no obligation to accept HG Wholesale's application to be an approved wholesaler in order to ensure Kable could sufficiently perform under the December MSA.

The second factor looks to Comag's motive. "Only if the defendant's *sole* motive was to interfere with the contract will this factor support a finding of improper interference."[76] Self-protection by not allowing a new, industry-changing competitor into its market does not make it improper.[77]

---

[74] Hudson Br. at 21.

[75] *NAMA Holdings LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014) ("The adjective 'improper' is critical. For participants in a competitive capitalist economy, some types of intentional interference with contractual relations are a legitimate part of doing business. . . . Determining when intentional interference becomes improper requires a 'complex normative judgment relating to justification' based on the facts of the case and 'an evaluation of many factors.'") (internal citations omitted).

[76] *WaveDivision Holdings*, 49 A.3d at 1174 (emphasis in original).

The third factor looks to whether the underlying relationship that Comag interfered with violates public policy or justified the inducement of the breach. Kable knew that it could not obtain Comag's approval on its own (because it tried and failed), so it attempted to get that approval through HG Wholesale. The fact that it did not succeed does not make that failure tortious.

The fourth factor looks to the interests Comag sought to promote through its denial. Kable admits that it was a threat to the business. Accordingly, Comag was protecting itself.

The fifth factor "permits the Court to consider the social utility of the interests sought to be advanced by each of the litigants."[78] Kable was attempting to break into the market with a new business strategy for magazine wholesalers. Comag was trying to protect the industry (and its place in it) as it already was.

The sixth factor looks to the degree of separation between the action and the consequence of Comag's actions. Here, Hudson claims that any damage done by Comag's action was done to HG Wholesale, not to Kable. Because of the derivative nature of Kable's damages, Comag's actions are, at least, once-removed

---

[77] *Id.* ("Here, the Superior Court recognized that the IRN Holders and Senior Lenders were motivated at least in part by a desire to protect their investment in Millennium, and not solely by a desire to interfere with a Wave–Millennium deal. Thus, the Superior Court properly concluded that the motive factor weighed in favor of justification.")

[78] *Hursey Porter & Assocs. v. Bounds*, 1994 WL 762670, at *15 (Del. Super. Ct. Dec. 2, 1994) (citing RESTATEMENT (SECOND) OF TORTS § 767 cmt. g (1979)).

-25-

from any alleged damage.[79] It was Kable's inability to perform under the December MSA that resulted in its termination, not Comag's decision to deny HG Wholesale's application.

The seventh factor allows the Court to look at the relationships between any parties involved in the suit to see if the interference is improper. Kable alleges that Comag denied HG Wholesale's application to benefit TNG and Hudson, as Comag is an affiliate of TNG and Hudson. But, Comag is privileged to do business with the companies it chooses. And, given the nature of the December MSA, Comag was under no obligation (contractual or other) to do business with HG Wholesale or Kable. Choosing a better deal absent any obligation to perform otherwise does not tortious interference make. Given the allegations presented and drawing every *reasonable* inference in Kable's favor, Kable still would not be entitled to recover for tortious interference with contractual relations under any *reasonably conceivable* set of circumstances.[80] The Court **GRANTS** Defendants' motion to dismiss as to this count.

---

[79] *See Kuroda v. SPJS Holdings,* 971 A.2d 872, 887 (Del. Ch. Apr. 15, 2009) ("All the harms that Kuroda allegedly suffered as a result of defendants' allegedly tortious conduct only affected Kuroda through his interest in Fugen. Accordingly, any claim for those damages must be asserted by Fugen, and Kuroda has not properly asserted a derivative claim on behalf of Fugen.").

[80] *Solow v. Aspect Res., LLC,* 2004 WL 2694916, at *2 (Del. Ch. Oct. 19, 2004) ("[C]onclusory statements – those unsupported by well-pled factual allegations – will not be accepted as true. The Court will, however, draw all inferences logically flowing from the First Amended Complaint in favor of the plaintiffs but only if such inferences are reasonable.") (citing

## B. Tortious Interference with Prospective Contractual Relations

To establish a claim for tortious interference with prospective business relations, Kable must establish "([1]) the reasonable probability of a business opportunity, ([2]) the intentional interference by defendant with that opportunity, ([3]) proximate causation, and ([4]) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner."[81]

### 1. Kable Had No Reasonable Expectation of Prospective Business Relations.

The most crucial element to tortious interference with prospective business opportunity is the existence of an actual, prospective business opportunity. The type of business opportunities protected by this rule are "any prospective contractual relations . . . if the potential contract would be of pecuniary value to the plaintiff."[82] "It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial

---

*Grobow v. Perot,* 539 A.2d 180, 187 (Del. 1988) (stating that "conclusionary allegations of fact or law not supported by allegations of specific fact may not be taken as true" and that the court "need not . . . draw all inferences from [the allegations] in plaintiffs' favor unless they are reasonable inferences.").

[81]    *DeBonaventura v. Nationwide Mut. Ins. Co.,* 419 A.2d 942, 947 (Del. Ch. 1980) (citations omitted).

[82]    Restatement (Second) of Torts § 766B cmt. c (1979).

benefits in recognition of a moral obligation."[83] A "perception" that there will be a prospective business opportunity is not enough.[84] "[T]he probability of the business opportunity must be assessed at the time of the alleged interference."[85]

In its attempt to show that it had prospective business opportunities in its new business model, Kable contends: (1) that several major publishers and national distributors "expressed favorable opinions" to HGR regarding HGR's intent to have magazines shipped directly to it through an out-sourced relationship that Kable proposed,[86] and (2) "[b]ased on subsequent discussions with representatives from [HGR], [Kable] understood that [many publishers and retailers] told [HGR] that they would support the new business model . . . and would . . . permit their magazines to be distributed . . . once the business model . . . was in effect. [O]ther retailers . . . expressed interest to [Kable] in pursuing possible business relationship with [Kable] based on how [it's] business evolved with [HGR.]"[87]

---

[83]     *Id.*

[84]     *See Dionisi v. DeCampli*, 1995 WL 398536, at *13 (Del. Ch. June 28, 1995) ("D & D never signed an exclusivity contract with DuPont or anyone else.  A perception that D & D would receive work from DuPont, without more, is insufficient to form the basis of a *bona fide* expectancy.").

[85]     *Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001).

[86]     Pl.'s Am. Compl. ¶ 19.

[87]     Pl.'s Am. Compl. ¶ 20.

Hudson claims the first argument cannot stand because the expressions of interest were not made to Kable. It claims Kable does not allege any relationship between itself and the entities that were "favorable" toward HGR or any expressions made to anyone in a relationship with Kable. As such, Hudson claims Kable had a perception of HGR's perception of the opportunities.[88]

Hudson claims Kable's second argument cannot stand either, because the statements were made to HGR, not Kable. Further, any interest that was directly expressed to Kable was contingent on its successful performance of its work with HGR. Hudson argues that this expectancy was not reasonable at the time of the alleged interference. Hudson claims that such success with a new business model was mere speculation, and cannot sustain the allegation that it was reasonably expected.[89] Defendants are correct.

The significant act relates back to Comag's refusal to designate HG Wholesale as an approved wholesaler. Comag was privileged to do so. A claim of tortious interference with any prospective opportunity is subject to the defendant's privilege to compete with the plaintiff.[90] Kable readily admits it was attempting to

---

[88] Hudson Br. at 31.

[89] Hudson Br. at 32.

[90] *Wayman Fire Protection, Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *10 (Del. Ch. Mar. 5, 2014) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1152 (Del. 1981) ("Furthermore, all of these requirements [for tortious interference with

-29-

implement a "direct challenge" to the business models of all the Defendants in the Complaint. As such, Hudson alleges that Comag's denial is not tortious interference with a prospective business opportunity, but normal industry competition.

### 2. Defendants Did Not Improperly Interfere With Any Prospective Contractual Relations If They Did Exist.

Even if Kable establishes that there was a reasonable probability of a business opportunity created by their new system, there is a "privilege enjoyed by competitors in the same market to compete aggressively for market share."[91] The Restatement (Second) of Torts says that there is no improper interference with prospective contractual relations if

> (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other.[92]

The same analysis used to decide whether or not there was improper interference with contractual relations applies here. Thereunder, no charge of improper interference with prospective contractual relations can be sustained. So,

---

prospective business relations] must be considered in light of a defendant's privilege to compete or protect his business interests in a lawful manner.").

[91] *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1291, 1287 (Del. Super. Ct. Oct. 3, 2001).

[92] RESTATEMENT (SECOND) OF TORTS, § 768 (1979).

again, given the specifics alleged, Kable would not be entitled to recover under any reasonably conceivable set of circumstances. And so, the Court **GRANTS** Defendant's motion to dismiss as to this count.

## C. CIVIL CONSPIRACY

Delaware law defines civil conspiracy as "the combination of two or more persons or entities either for an unlawful purpose, or for the accomplishment of a lawful purpose by unlawful means, resulting in damage."[93] "Civil conspiracy is not an independent cause of action in Delaware – it must arise from some underlying wrong."[94]

The essence of Kable's civil conspiracy claim is that Comag refused to grant HG Wholesale approved wholesaler status because Defendants worked together to keep Kable and HG Wholesale out of the market. On the facts as presented by Kable, Defendants neither tortuously interfered with the December MSA nor tortuously interfered with any prospective contractual relations Kable had because they merely acted as business competitors and chose a better deal. As both these

---

[93] *Brooks-McCollum v. Shareef*, 2006 WL 3587246, at *3 (Del. Super. Ct. Nov. 1, 2006).

[94] *Naples v. New Castle Cty.*, 2015 WL 1478206, at *15 (Del. Super. Ct. Mar. 30, 2015), *aff'd* 2015 WL 6850660 (Del. Nov. 6, 2015). Delaware follows the majority approach in requiring the existence of an underlying tort for a civil conspiracy claim. *See, e.g., Ramunno v. Cawley*, 705 A.2d 1019, 1039 (Del. 1998); *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149–50 (Del. 1987) (setting forth elements plaintiff must prove for civil conspiracy, including "an unlawful act done in furtherance of the conspiracy"); *See also Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 405–06 (3d Cir. 2000) (noting the general rule that "civil conspiracy may not exist without an underlying tort is a common one" and noting it was unaware of any jurisdiction that recognized a civil conspiracy claim without separate tortious conduct.).

claims lack evidentiary support, Kable cannot establish an underlying wrong on which to hang his civil conspiracy claim.[95] Defendants' motions on this claim are **GRANTED**.

## VI. CONCLUSION

On the record before the Court, there is insufficient pleading of fact to support any of Kable's claims against the Defendants. There are no specific facts supporting claims of intentional action to improperly interfere with the December MSA or any alleged prospective business relations. And what is pled would not allow Kable to recover on the interference claims under any reasonably conceivable set of circumstances. Because these two claims fail, the civil conspiracy claim fails as well. Accordingly, for the reasons stated above, the Defendants' Motions to Dismiss are **GRANTED**.

**IT IS SO ORDERED**.

Paul R. Wallace, Judge

---

[95] *Naples*, 2015 WL 1478206, at *15.